Taylor, C.J., and Corrigan, Young, and Markman, JJ.
With her dissent, Justice WEAVER completes a transformation begun five years ago, when all six of her colleagues voted not to renew her tenure as Chief Justice of this Court. This transformation is based neither on principle nor on “independent” views, but is rooted in personal resentment. This transformation culminates today in irresponsible and false charges that four of her colleagues are “bias[ed] and prejudiced] ” against attorney Geoffrey Fieger and therefore must be disqualified from hearing his cases — a call that Justice WEAVER, who has received Mr. Fieger’s political support, seems to believe that she is uniquely privileged to make. See post at 328. But just as troubling, Justice Weaver’s personal agenda causes her to advance arguments— adopted wholesale from Mr. Fieger’s past disqualification motions — that would lead to nonsensical results, affecting every judge in Michigan and throwing the justice system into chaos. We have addressed these *267 arguments on a number of occasions, but we do so again here in light of Justice Weaver’s unwarranted accusations.
In essence, Justice WEAVER would create an environment within this state that would affect every judge and that would prove utterly untenable. A judge could run for election, but could not campaign. A judge could be sued, but could not defend himself or herself. A judge could witness misconduct, but could not report it. Judges could be removed from cases at the option of attorneys and litigants, who could instigate pubhc attacks and lawsuits against judges to force their disqualification. Judges would be intimidated, subtly and not so subtly, from carrying out their constitutionally ordained duties.
In Justice Weaver’s view, only justices who have received Mr. Fieger’s support — as she has — can decide whether Mr. Fieger’s public statements (suggesting the sodomization of judges who rule against his client and characterizing such judges as “assholes”) violate Michigan’s standards of attorney conduct. Judges who have been the object of his opposition would not be allowed to participate. It is interesting that Justice WEAVER largely grounds her arguments of “bias and prejudice” in statements that occurred between six and ten years ago. And, until very late in the process of handling this case, Justice WEAVER — who was well aware of these statements through prior disqualification motions from Mr. Fieger — did not take the position that those statements required our disqualification. One can measure the sincerity of Justice Weaver’s accusations today by her own conduct in this case. She claims today that she was compelled to publish her belief that our bias disqualifies us to participate in this case because Mr. Fieger is a “party.” But Mr. Fieger has always been a party in this *268 case. Moreover, in two sets of disqualification motions filed by Mr. Fieger in this case, not once did Justice WEAVER ever state in the statements she filed in response to those motions that we were disqualified from participating in this case. As late as last month, when Mr. Fieger’s last motion to disqualify was rejected, Justice WEAVER declined to participate and failed to state that any of the Fieger accusations she now adopts compelled our disqualification. See Grievance Administrator v Fieger, 475 Mich 1211 (2006). Nothing has changed since June 1, 2006.
It is deeply troubling that a member of this Court would undertake so gratuitously, and so falsely, to impugn her colleagues. This is a sad day in this Court’s history, for Justice WEAVER inflicts damage not only on her colleagues, but also on this Court as an institution. However, we do not intend to be deterred by false accusations from carrying out our constitutional duty to hear cases, including those in which Mr. Fieger is involved, and to decide these cases fairly and evenhandedly, as we have always done in the past. In particular, we invite public scrutiny of this Court’s record in cases in which Mr. Fieger, personally, and his clients have been involved.
In making her charges of “bias and prejudice” Justice WEAVER essentially adopts verbatim arguments made by Mr. Fieger in various disqualification motions that each of us has already considered and rejected. However, in light of Justice WEAVER’S unwarranted characterization of our positions, we explain here why we did so.
I. STATEMENTS CONCERNING MR. FIEGER
Justice WEAVER first focuses on statements made during the campaigns of three of us in 2000. (It is puzzling that Justice WEAVER has never before cited *269 these statements as a basis for our disqualification, given that Mr. Fieger has repeatedly cited the same statements in earlier disqualification motions that he has brought since 2000.) None of these statements properly serves as a basis for disqualifying any of us; indeed, such statements merely reflect the reality of Michigan’s constitutionally mandated system of democratically electing its judiciary.
Under our Constitution, candidates for the Supreme Court are nominated at party conventions and run for election. Const 1963, art 6, § 2. In 1998, Mr. Fieger ran for Governor of Michigan on the Democrat ticket. As such, in 2000, he was the most visible member and the titular head of the Michigan Democrat Party, which was then channeling millions of dollars in opposition to our election campaigns. Mr. Fieger was outspoken, particularly about his views of our state’s legal and judicial systems, and his statements received a great deal of exposure through both the media and opposition campaign communications. In addition, Mr. Fieger himself contributed substantial amounts of money in opposition to our campaigns while also being highly vocal in his political opposition.
These were Mr. Fieger’s prerogatives. Yet under Justice WEAVER’S analysis, neither we nor our supporters could exercise our own prerogatives to ever mention these facts in our campaigns. That is, despite our individual judgments that references by our campaigns to Mr. Fieger’s opposition would assist the public in understanding our judicial positions, and would effectively contrast these positions with those of the candidates running against us, Justice WEAVER would preclude judicial candidates from communicating truthful statements to the public. In her view, statements concerning the identity of political opposition could never *270 be uttered lest a judicial candidate be forever precluded from hearing cases involving such persons. The public would not benefit by having less, rather than more, information about a judicial candidate. A highly visible and outspoken public figure, who is an integral part of the political opposition to a judicial candidate, cannot be insulated from mention, or even criticism, in a judicial campaign because he also happens to be a lawyer. Yet this follows if every such mention, or criticism, of political opposition requires judicial disqualification. Even more troubling, Justice WEAVER’S approach to disqualification would sharply skew the campaign process. Her approach would silence judicial candidates criticized by those with regular contact with the legal system — e.g., lawyers — while permitting forceful responses from judicial candidates whose opposition comes from different quarters. Justice WEAVER would tie the hands of some — but only some — judicial candidates in defining themselves and in characterizing their judicial philosophies, not only to the detriment of those candidates, but to the detriment of the public’s ability to intelligently distinguish between candidates for judicial office.
In perhaps her most troubling premise, Justice WEAVER suggests that a judicial candidate is biased with regard to individuals or organizations identified as opposing his or her candidacy. Yet Justice WEAVER fails to recognize that the reverse would then also be true. Would not a judicial candidate who has received the public support or endorsement of an individual or organization be, by the same token, “biased or prejudiced” in favor of those parties? “Bias or prejudice” is not a one-way street. “Bias or prejudice” can be shown either in favor of or in opposition to an individual or organization. Judges in this state (including each of the justices of this Court) who have run for election have *271 sought, and garnered, support from individuals and organizations, both in the form of financial assistance and endorsements. Examples of those who have offered support include labor unions, businesses and business organizations, lawyer organizations, trade associations, interest groups, prominent citizens, political leaders, and the like. Moreover, judges in this state (including, again, each of the justices on this Court) have routinely communicated such support through campaign advertising, public speeches, newspaper interviews, and fund-raising efforts.[1]
Indeed, to apply her own rule to herself, Justice WEAVER would certainly be precluded from participation in the instant case in light of the fact that she received financial contributions — the most compelling form of all endorsements — from Mr. Fieger in her most recent campaign.[2]
In short, Justice Weaver’s position has far-reaching implications for judicial selection in Michigan, which *272 the people of this state, through their Constitution, have placed into the political process. None could contest — and tellingly, Justice WEAVER herself does not contend — that any of the statements she cites in support of her allegation that we are “bias[ed] and prejudice[d]” was untrue. It shows no inherent “bias or prejudice” to point out Mr. Fieger’s opposition. Similarly, it shows no “bias or prejudice” to identify the number of cases Mr. Fieger had on appeal at the time as a possible explanation for his interest in who sat on this Court. Such reference states no animus toward him, but only suggests the obvious: that Mr. Fieger is supporting and opposing candidates at least in part because he wants judges who will be most philosophically predisposed toward his cases. These statements, in our judgment, as well as identifying whom Mr. Fieger supported and whom he opposed, were a reasonable way of explaining his active participation in our campaigns and drawing relevant and comprehensible distinctions between us and our opponents. In this regard, the United States Supreme Court has observed:
[Olpposition [to judicial elections] may be well taken (it certainly had the support of the Founders of the Federal Government), but the First Amendment does not permit it to achieve its goal by leaving the principle of elections in place while preventing candidates from discussing what the elections are about. “The greater power to dispense with elections altogether does not include the lesser power to conduct elections under conditions of state-imposed voter ignorance. If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process... the First Amendment rights that attach to their roles.” [Republican Party of Minnesota v White, 536 US 765, 787-788; 122 S Ct 2528; 153 L Ed 2d 694 (2002) (citation omitted).]
*273 In Michigan, and in other states with an elected judiciary and competitive and well-financed judicial campaigns, statements of the sort referenced by Mr. Fieger and Justice WEAVER must be permissible to help the people make informed choices among judicial candidates of differing philosophies.
The statements that were made in 2000 were accurate, relevant, and, we believe, entirely fair commentary on aspects of that year’s judicial election. As was noted in Adair v Michigan, 474 Mich 1027, 1042 (2006) (statement by TAYLOR, C.J., and MARKMAN, J.), if a judge does that which the law and the standards of conduct permit, such action cannot ordinarily serve as the basis for disqualification. To hold otherwise would be to make the law into a “snare” for those who are operating well within its boundaries.
There is nothing in these statements made in 2000 that would suggest that Mr. Fieger cannot obtain a fair hearing in our courtroom. We believe that this is underscored by this Court’s treatment of cases in which Mr. Fieger was counsel, as well as cases in which he was a party himself, over the past seven years. We are content to maintain Michigan law as it has always been; a judge is not automatically disqualified from hearing a case involving those who have been either the judge’s campaign supporters or opponents.
II. “ENMESHMENT” WITH MR. FIEGER
Justice WEAVER next focuses on the lawsuits that Mr. Fieger has filed against us as justices of this Court. Here, Justice WEAVER again essentially adopts verbatim Mr. Fieger’s novel theory that a judge becomes “enmeshed” with one who sues him and that, as a result, that judge necessarily must be tempted to “vent his spleen” against the person. Under Justice WEAVER’S *274 reasoning, a judge becomes “enmeshed” at the sole option of the person who sues the judge. As one of us recently wrote in response to Mr. Fieger’s “enmeshment” argument:
[Such “enmeshment” exists] only because [Mr. Fieger] by his own actions, specifically by initiating a series of federal lawsuits against me and other Justices of this Court, has so “enmeshed” me. It cannot be that a judge can be required to disqualify himself or herself simply on the basis of such lawsuits. Grace v Leitman, 474 Mich 1081 (2006); People v Bero, 168 Mich App 545, 552 [425 NW2d 138] (1988). To allow [Mr. Fieger’s] lawsuits to constitute a basis for my disqualification because I have thereby become “enmeshed” with him would simply be to incentivize such lawsuits on the part of any attorney or litigant desirous of excluding a disfavored judge from participation in his or her case. [Grievance Administrator v Fieger, 475 Mich 1211, 1212 (2006) (statement by MARKMAN, J.).]
Moreover, Justice Weaver’s argument that a judge cannot defend himself or herself against a frivolous lawsuit, or attempt to deter future frivolous lawsuits, by seeking sanctions when such lawsuits are brought would merely encourage frivolous lawsuits against judges. Indeed, if anyone can force a judge’s disqualification merely by suing that judge, then any litigant would have an easy method of judge-shopping, eliminating disfavored judges until the desired judge has been obtained. The destructive effect of such a rule is too obvious to require further elaboration.
In the same “enmeshment” vein, Justice WEAVER cites several occasions on which Mr. Fieger has called us names or impugned us (e.g., “stupid,” never “practiced law,” has a “political agenda”), and again asserts that this has predisposed us against him. Again, Justice WEAVER’S reasoning makes disqualification available at the instigator’s sole option. But, it is clearly the law that *275 a lawyer cannot precipitate a basis for disqualification by being a provocateur. People v Bero, supra at 552. As one of us wrote earlier in response to Mr. Fieger when he originally raised this same argument:
[Mr. Fieger] argues that I have been a “target of personal abuse” from him and cannot be fair toward him. Whatever “abuse” respondent may or may not have directed toward me, I have never once called into question the propriety of his conduct. I have never questioned his right to direct any public criticism toward me or to undertake any financial contributions against me in the course of my campaigns for judicial office. Once again, it cannot be that a judge can be required to disqualify himself or herself on the basis of “abuse” that he has allegedly received from an attorney or litigant. To allow such conduct to constitute a basis for my disqualification would again simply be to incentivize such conduct on the part of any attorney or litigant desirous of excluding a disfavored judge from participation in his or her case. [Grievance Administrator v Fieger, supra at 1212 (statement by MARKMAN, J.).]
It may sometimes be the case that, under circumstances such as these, a judge must conclude that he or she cannot decide a matter impartially. But, for the first 169 years of this Court’s existence, that decision has always belonged to the justice alone.
in. LETTER REFERENCING MR. FIEGER
Justice WEAVER next focuses on a statement from a fund-raising letter, sent by former Michigan Governor John Engler, that mentions Mr. Fieger’s name.[3] How *276 ever, far from showing any “bias or prejudice” on any judge’s part, this letter again merely bespeaks the reality of our state’s system of democratic judicial elections. In order for candidates for the Supreme Court to successfully run statewide campaigns for judicial *277 office, their campaign committees must raise sufficient funds to pay for campaign advertising and other campaign costs.
Indeed, as this letter indicates, the need for such funds has recently become substantially more intense. Judicial campaigns have become considerably more expensive as an increasing range of interest organizations have come to participate in these campaigns, “independent opposition” campaigns have emerged, and substantial last-minute infusions of opposition campaign spending have appeared, on one occasion on an anonymous basis.[4] In 2004, Mr. Fieger, by his own later admission in October 2005, orchestrated just such an anonymous campaign days before the election, spending $460,000 on opposition advertising. Raising money to address such efforts is a new and critical focus of contemporary judicial campaigns. The potential for significant, and well-funded, opposition requires fund-raising to offset the high costs of responding. That a fund-raising letter from a supporter cites these relevant historical facts in order to make more persuasive a plea for campaign contributions does not prevent a judge from faithfully performing his or her sworn duties.
IV REFERRAL OF MR. FIEGER
Justice WEAVER next cites the fact that one of us referred Mr. Fieger to the Attorney Grievance Commission in 1996. In essence, she faults that justice for complying with attorney ethics rules. The Michigan Rules of Professional Conduct provide:
*278 A lawyer having knowledge that another lawyer has committed a significant violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer’s honesty, trustworthiness, or fitness as a lawyer shall inform the Attorney Grievance Commission. [MRPC 8.3(a) (emphasis added).]
In other words, a judge is obligated to inform the Attorney Grievance Commission about an attorney’s perceived misconduct; to fail to do so is to violate an explicit ethics rule. This rule does not distinguish between a judge who observes the alleged misconduct and a judge who is the object of it. But, under Justice WEAVER’S reasoning, a judge must either turn a blind eye to attorney misconduct or risk disqualification. This simply cannot be. On the contrary, a judge who meets his or her ethical obligation to report attorney misconduct is not thereby assumed to be biased or unable to review impartially cases that come before him or her.[5]
Additionally, our Court — usually with Justice Weaver’s participation — has at times directed our clerk of court to refer attorneys to the Attorney Grievance Commission and judges to the Judicial Tenure Commission for investigation. No one has ever suggested that this practice, necessary when attorney or judicial conduct warrants further inquiry, bars justices from later considering either those cases or other cases involving *279 these attorneys or judges. By Justice Weaver’s logic, because the mere act of referral displays actual bias, justices could never again sit whenever an attorney’s or a judge’s prior act had warranted a referral for investigation.
V further observations
(1) Justice WEAVER, until late in the consideration of this case, did not mention what she now cites as evidence of our actual “bias and prejudice,” statements made during the 2000 campaign. Six years have passed, during which none of us has made any additional statements concerning Mr. Fieger, and during which Mr. Fieger has filed numerous disqualification motions in which he has referenced the same campaign statements from 2000.
(2) In concluding that we have actual “bias and prejudice” toward Mr. Fieger, Justice WEAVER not only professes to read our minds, but intimates that she does so on the basis of access to information not generally available to the public. Neither is true.
(3) Justice WEAVER here departs from her previous practice in which, in numerous cases, she adhered to exactly the rule the majority is maintaining — that a justice resolves his or her own disqualification. In fact, as Justice WEAVER conceded in Advocacy Org for Patients & Providers v Auto Club Ins Ass’n, 472 Mich 91, 96 n 1; 693 NW2d 358 (2005) (WEAVER, J., concurring), she herself has elected not to participate in cases 251 times — a determination reached on each occasion without the participation of any other justice. As recently as June 1, 2006, she declined to decide Mr. Fieger’s motions for disqualification directed at us in this case, deferring instead to our determinations as the justices targeted by these motions. Grievance Administrator v *280 Fieger, 475 Mich 1211 (2006) (statement by WEAVER, J.). Without explanation, she now abandons all her previous practices on this Court and asserts that she may participate in deciding disqualification motions directed at another justice, at her sole discretion.[6] (It is also noteworthy that Justice Weaver’s particularized concerns about Mr. Fieger’s disqualification motions began only after Mr. Fieger ceased targeting her with these motions.)
(4) Justice Weaver’s concerns about alleged “bias and prejudice,” grounded in large part on statements made in 2000 and a referral to the Attorney Grievance Commission made in 1996 — neither of which has ever before been a concern of hers — is of a kind with other newfound concerns: (a) after 31 years on the bench, and, not surprisingly, never having uttered a word in favor of judicial term limits, and with the four of us having become a philosophical majority on the Court, Justice WEAVER, after announcing her intention to resign, suddenly announces her intention to not resign, promising to use her position on this Court to garner legislative support for judicial term limits; (b) after 31 years on the bench, having never uttered a word concerning the disqualification procedures that this Court has followed since 1837, and with the four of us having become the exclusive subject of disqualification motions, overwhelmingly offered by Mr. Fieger, Justice WEAVER has suddenly become a champion of altering *281 disqualification procedures to make it easier to disqualify a justice for frivolous or political reasons; and (c) after 31 years on the bench, never having uttered a word about court rules that specify when judges may participate in cases involving parties that employ relatives, Justice WEAVER suddenly demands a new standard applicable to a select group of her colleagues.
VI. CONCLUSION
Each of us during our judicial service has sought to follow the highest standards of ethics and professionalism. We have sought to give faithful meaning to the law, to decide disputes fairly and impartially, and to approach each case without bias or prejudice. We are each proud of our records on this Court and, as long as we serve, are committed to conferring on every attorney and every litigant — Mr. Fieger not excepted — equal and evenhanded treatment under the law. And that is exactly what we have done in this case. A judge need not admire an individual, or respect his or her actions, in order to be able to accord the individual that which eveiy parly before this Court deserves — equal justice under law. We have looked into ourselves, as we must do whenever there is a motion for disqualification, and indeed even sometimes when there is not, and each of us has concluded that he or she is able to accord fair and impartial treatment to Mr. Fieger in this case. We believe that our individual records over the past eight years in addressing cases concerning Mr. Fieger personally, as well as his clients, clearly demonstrate this commitment.
The people of Michigan deserve better than they have gotten from Justice WEAVER today, and so do we, her colleagues.
Corrigan, Young, and Markman, JJ., concurred with Taylor, C.J.

 There is no reason why the absence of support or opposition cannot also be viewed as triggering respectively negative or affirmative “biases or prejudices.” Surely, for example, if support or opposition from some person or organization that has traditionally been directed toward a candidate nominated by one political party does not occur in a particular instance, there is no reason why such a candidate could not, under Justice Weaver’s analysis, he viewed as “biased or prejudiced.”

 Justice Weaver dismisses Mr. Fieger’s $400 contribution as “the only ‘support’ that Mr. Fieger gave my campaign committee,” post at 343, as if somehow a financial contribution does not constitute real support for a judicial candidate. Moreover, a financial contribution has meaning beyond the dollar amount. It expresses, in a very public and concrete way, the contributor’s confidence in the candidate and legitimizes the candidate within the area of the contributor’s influence; that expression of confidence becomes all the more meaningful when the contributor enjoys a certain stature or is emblematic of some point of view. Precisely because of these considerations, Mr. Fieger’s support of Justice Weaver, and her acceptance and public announcement of that contribution, communicates far more than simply the dollar amount of the contribution.

 The complete letter is as follows:
One of my proudest legacies as Governor was having the honor of first appointing, then supporting jurists like Justice Mauea Corrigan. Justice Corrigan has worked to recast the Michigan Supreme Court into a nationally recognized court. Today, the MSC is one of the most important voices of judicial restraint and limited *276 government. So esteemed is Justice Corrigan that she has twice been on President Bush’s short list for the U.S. Supreme Court.
Justice Corrigan was elected to the Michigan Supreme Court in 1998 and served two terms as Chief Justice from 2001-2004. This November, she is seeking reelection to another eight-year term. Justice Corrigan has proven unequivocally by her record that Michigan will benefit from her continuing service on our state’s highest court. We must work to retain our best and brightest.
In Michigan, we no longer have a Court where judges think that it is their prerogative to decide important policy questions. The majority on the Court understands the constitutional role of the judiciary.
Naturally, judicial activists in Michigan have been unhappy with our Supreme Court. They had grown accustomed to winning court rulings that they couldn’t achieve through the democratic and representative process of government. Every time there is a state Supreme Court election, these activists are on the prowl, seeking to restore those good old days. This year will be no exception! We cannot lower our guard should the Fiegers of the trial bar raise and spend large amounts of money in hopes of altering the election by an 11th hour sneak attack.
I believe our Michigan Supreme Court is truly exceptional. We simply cannot risk a return to the days of legislating from the Bench. The court needs to keep Justice Corrigan, a proven, experienced, and thoughtful jurist. In the past you have contributed to the Supreme Court race. I ask that you consider making a similar contribution or as much of the maximum amount allowed by law for any individual which is $3,400. Please show your support by sending your contribution today.
Your help in returning Justice Maura Corrigan to the Michigan Supreme Court will protect the growing reputation of Michigan’s highest court.

 Moreover, the fact that Mr. Fieger would wish to maintain his anonymity by fading to report a contribution, as occurred in the 2004 campaign, may suggest precisely why those who are the targets of his contributions would wish, as occurred during 2000, to identify Mr. Fieger as a contributor to their opponents.

 Moreover, even if, for the sake of argument, an Attorney Grievance Commission referral may have required a judge’s disqualification at some point in time — which we emphatically believe it does not — the thread running through Mr. Fieger’s (and Justice Weaver’s) analyses is that, once a judge has ever done something that may require his or her disqualification — utter a remark six years ago about a lawyer, refer a lawyer ten years ago to a disciplinary body — this effectively imposes a lifetime disability on that judge. This is manifestly incorrect. The proper inquiry is not whether a judge, at some point in time may have been unable to consider a person’s case impartially, but whether the judge is presently unable to do so.

 Moreover, when, on rare occasion, Justice Weaver herself has been the object of a disqualification motion, as in Graves v Warner Bros, 469 Mich 853, 854 (2003), she has been comfortable to conclude, “I am neither biased nor prejudiced for or against any of the parties or their attorneys in this case, and plaintiff asserts no grounds supporting my recusal from participating in this appeal.” Thus, as long as disqualification motions have been directed against her, Justice Weaver has been content to conform with the longstanding disqualification practices of justices of this Court. When, however, such motions are directed toward other justices, she now advocates that her own involvement is required.